## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | | |
| **(1)** | **5872 BELLA MARIE WAY FREDERICK, MARYLAND 21703** | Case No.   23-mj-0993-TJS |
| **(2)** | **LEXUS RX450 BEARING MARYLAND REGISTRATION 1FD8845 AND VIN: 2T2HGMDA0LC056213** | Case No.   23-mj-0994-TJS |
| **(3)** | **THE PERSON OF ABDUL TURAY a/k/a ABDUL KARIM TURAY, ABDUL IBRAHIM TURAY, and ABDUL KARIM IBRAHIM TURAY, JR.** | Case No.   23-mj-0995-TJS |
| | | **FILED UNDER SEAL** |

PDK/TFH

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

2:09 pm, Jun 14 2023

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ JJ _____ Deputy

### AFFIDAVIT IN SUPPORT OF AN APPLICATION
### UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Task Force Officer Thomas Davis, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the locations known as:

   a.       The residence located at 5872 Bella Marie Way Frederick, Maryland 21703, as further described in Attachment A-1 (the "**TARGET RESIDENCE**"), further described in Attachment A-1, for the things described in Attachment B;

   b.       a 2020 Lexus 450 bearing Maryland registration 1FD8845 and VIN: 2T2HGMDA0LC056213(the "**TARGET VEHICLE**"), further described in Attachment A-2, for the things described in Attachment B.

      c.      The person of Abdul TURAY, a/k/a Abdul Karim TURAY, Abdul Ibrahim TURAY, and Abdul Karim Ibrahim TURAY, Jr. (hereinafter, "**TURAY**") and items within his immediate vicinity and control, as further described in Attachment A-3, for evidence described in Attachment B; including (but not limited to ) his cellphone or other electronic devices.

3.      I am a Task Force Officer ("TFO") for the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI").  I have been a police officer with the Maryland Transportation Authority Police ("MDTAP") since 2003 and have been assigned to HSI Baltimore, as a TFO with the Border Enforcement Security Team ("BEST") since 2016.  I have investigated unlawful acts and violations of both federal and state law.  I have participated in numerous federal and state investigations relating to drug trafficking, drug smuggling, money laundering, financial fraud and the illegal export of stolen motor vehicles. Since being assigned to HSI BEST, I have been directly involved with interdiction and recovery of over 250 stolen motor vehicles at the Port of Baltimore, many of which were acquired by fraud and identity theft.

4.      The facts contained in this affidavit are based on my personal knowledge as well as that of the other agents involved in this investigation. All observations that were not made personally by me were related to me by persons with knowledge of this investigation. I submit that this affidavit contains the information necessary to establish probable cause to support the application for the requested search warrant. This affidavit is not intended to include each, and every fact and matter observed by or made known to agents of the government. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5.      As set forth below, based upon my training and experience, and the facts in this affidavit, there is probable cause to believe that **TURAY**, Rodley BALTHAZAR ("BALTHAZAR"), Jonathan DAVIS ("DAVIS") and others committed conspiracy to commit interstate transportation of stolen motor vehicles, in violation of 18 U.S.C. § 371, and receipt and

possession of stolen vehicles, in violation of 18 U.S.C. § 2313, from in or about September 2019 and in or about June 2022, and that **TURAY** committed bank fraud, in violation of 18 U.S.C. § 1344 (collectively, the "**Target Offenses**"), in or about September 2022, and that evidence of the **Target Offenses** will be found in the **TARGET RESIDENCE**, the **TARGET VEHICLE**, and on **TURAY**'s person.

6. On March 1, 2023, a federal grand jury in the District of Maryland returned a sealed superseding indictment charging **TURAY** and BALTHAZAR with conspiracy to commit interstate transportation of stolen motor vehicles, in violation of 18 U.S.C. § 371, and receipt and possession of stolen vehicles, in violation of 18 U.S.C. § 2313. *See* Criminal No. PJM-23-032. DAVIS was charged by criminal information and convicted of receipt and possession of stolen vehicles on or about September 7, 2022. *See* Criminal No. PJM-22-297.

**BACKGROUND REGARDING FRAUD AND EXPORTATION INVESTIGATIONS**

7. Based upon my training and experience, I know that individuals involved in fraud schemes and schemes concerning the exportation of stolen goods keep written notes and other records in electronic and physical form to document their criminal enterprise. Based on my previous experience, I know that these records are often stored in a person's primary residence, in storage units, in vehicles and in the residences of associates and co-conspirators. I know based on my training, knowledge, and experience, that records relating to fraud schemes and efforts to export stolen motor vehicles, to include names of shell entities, payment information, shipping information, motor vehicle records, etc., are maintained in the safety of such places notwithstanding the passage of time.

8. I also know that these individuals use cell phones and other electronic storage devices in many different ways to further those crimes, and that this in turn permits the recovery of evidence, fruits, and instrumentalities from cell phones and other electronic storage devices

searched by law enforcement.  For example, cell phones may contain records and logs related to the length, timing, and content of communications between co-conspirators pertaining to the criminal enterprise.  As another example, cell phones and other electronic storage devices also are often linked to and contain information within them concerning electronic accounts or applications that are used by the individual in furtherance of the scheme.  Cell phones and other electronic storage devices also often contain images, videos, and other media that provide evidence, fruits, and instrumentalities of the criminal enterprise.  And cell phones and other electronic storage devices often contain location data, often associated with various media or applications, that provide valuable evidence of where the phone's user was at times relevant to the criminal enterprise.

## **PROBABLE CAUSE**

**I.**   **Introduction**

9.     Since July 2019, HSI B.E.S.T. has been investigating the auto theft and fraud conspiracy involving **TURAY**, BALTHAZAR, DAVIS and others known and unknown. On July 9, 2019, I received information from the Maryland Transportation Authority Police (MDTAP) regarding stolen vehicles that were potentially being exported from the Port of Baltimore to countries in West Africa. The stolen vehicles had been fraudulently rented from major rental car companies using fraudulent or stolen identities and fraudulent credit card information. The fraudulently rented vehicles were predominantly reserved through the rental car companies' online reservation systems. Through investigative measures, it was determined that fraudulently rented/stolen vehicles were being loaded into shipping containers at a vehicle storage lot, in Prince George's County Maryland. HSI B.E.S.T. initiated an investigation and through surveillance, determined that storage lot was a fenced in lot with a locked gate that stored vehicles and shipping containers.

10.     During the course of this investigation, HSI B.E.S.T. has identified 15 containerized export shipments of 42 vehicles, which have been positively linked to this investigation and subsequently recovered by U.S. Customs and Border Protection (CBP) at the Port of Baltimore. A review of the export paperwork has revealed that that none of the 42 vehicles were properly declared for export with CBP. This investigation has found that these vehicles were stolen through fraud, primarily from rental car companies in Maryland, Virginia, Washington D.C, New York, Delaware and North Carolina. Of the 42 vehicles recovered at the Port of Baltimore, two vehicles were stolen from private individuals during a robbery and an armed carjacking in Maryland and Washington D.C. In addition to the vehicles seized at the Port of Baltimore, four additional stolen vehicles associated with this investigation were recovered by HSI investigators in Prince Georges County, Maryland. The value of the stolen vehicles recovered during this investigation is in excess of approximately $1 million.

11.     On or about June 2, 2022, BALTHAZAR and two other co-conspirators were arrested in Nashville, Tennessee while occupying a stolen Chevrolet Equinox.  A total of four other stolen vehicles were also recovered from the same parking lot at the time of their arrest. Through records and information obtained from Avis, I learned that BALTHAZAR had fraudulently rented or attempted to rent at least eight additional vehicles between in or about April 2022 and in or about June 2022 at Avis locations in Georgia, Florida and Tennessee. The reservations for these Avis vehicles were made through Avis's online reservation system. Using GPS location data, Avis was able to track at least two of these vehicles to a location in Prince George's County, Maryland.  As detailed below, following his arrest, BALTHAZAR called **TURAY** to discuss bail.

12.     I subsequently learned from records obtained from Bank of America that in or about September 2022  **TURAY** deposited an altered check in the amount of $200,913.62 drawn on a victim account at U.S. Bank to his business account at Bank of America.  From in or about October 2022 through in or about November 2022, **TURAY** withdrew the proceeds of the altered check through ATM withdrawals at Bank of America locations in Maryland and debit card purchases.

13.     In addition, as detailed below, **TURAY** has at least two prior arrests in 2017 and 2019 involving suspected fraud, in which law enforcement seized fraudulent identification documents and fraudulent debit cards.

## II.     TURAY's Prior Arrests Involving Suspected Fraud

14.     According to a MDTAP police report, on or about February 6, 2016, **TURAY** was arrested during a traffic stop on Interstate 895 in Baltimore, Maryland.  **TURAY** was a passenger in a vehicle driven by another individual.  A search of the vehicle recovered the following items on the passenger side of the vehicle:  approximately ten Visa prepaid cards, a black MSR X6 card reader, and a re-encoder.  A laptop computer was also recovered from the driver's side of the vehicle.  Based on my knowledge, training, and experience, I know that these items are often indicative of credit card fraud.  Below is **TURAY**'s booking photograph from his February 2016 arrest:



15.     According to a MDTAP police report, on or about June 30, 2017, **TURAY** attempted to fly out of the Baltimore Washington International Airport ("BWI"), using a fraudulent Pennsylvania driver's license in the name of "Quincy Jackson" bearing **TURAY**'s photograph. **TURAY** presented that fraudulent identification to Transportation Security Administration ("TSA") agents at the screening and security point. When MDTAP officers attempted to arrest **TURAY**, he fled the screening point on foot. **TURAY** resisted arrest and was tased by police while being taken into custody.  A search incident to arrest of **TURAY**'s carry-on bag, revealed that **TURAY** was in possession of ten fraudulent credit cards in the name of "Quincy Jackson."  Below is a photograph of the fraudulent "Quincy Jackson" driver's license presented to TSA bearing **TURAY**'s photo:



Pictured below is **TURAY**'s valid Maryland identification card issued by the Maryland MVA on or about March 23, 2020:



16.     Eleven days after **TURAY**'s arrest at the BWI Airport, on or about July 11, 2017, MDTAP was dispatched to the Hertz BWI Airport rental location, for a report of a fraudulently rented vehicle. MDTAP investigators learned that an individual identifying himself as Quincy Jackson fraudulently rented a vehicle from the Hertz BWI Airport rental location. The suspect presented a fraudulent Pennsylvania Driver's license in the name of "Quincy Jackson" with the same driver's license number and identifying information that **TURAY** used during his previous arrest at the BWI Airport.

17.     According to a police report obtained from the Calvert County Sheriff's Office, on or about September 19, 2020, **TURAY** was a passenger in an SUV involved in a traffic stop and was arrested on outstanding warrants.   During a search incident to arrest and a probable cause search of the vehicle, **TURAY** was found to be in possession of eight California unemployment benefit (EDD) cards issued by Bank of America in the names of other individuals and approximately $13,461.52 in U.S. Currency.   When asked about the cards, **TURAY** indicated that he applied for unemployment benefits for others and would withdraw his "fee" from the cards.

8

18.     **TURAY** also has a prior 2011 felony robbery conviction in Prince George's County and multiple misdemeanor convictions in Prince George's County from 2011 for second degree assault and possession of a dangerous weapon with intent to injure.

### III.     TURAY's Involvement in the Stolen Rental Car Scheme

19.     On numerous occasions during physical and video surveillance in this investigation, **TURAY,** BALTHAZAR, DAVIS and other coconspirators were observed transporting stolen vehicles to various locations, including locations in Prince George's County, Maryland, where the stolen vehicles were loaded into shipping containers by **TURAY** and other coconspirators. Co-conspirators arranged for shipping containers containing stolen rental vehicles to be transported to the Port of Baltimore for export to countries in West Africa, including Sierra Leone.

20.     For example, on or about September 3, 2019, **TURAY** and BALTHAZAR drove a stolen red 2019 Jeep Wrangler with New York registration JGT5759 to a vehicle storage lot in Hyattsville, Maryland (the "Hyattsville lot"). DAVIS assisted in the delivery and drove **TURAY** and BALTHAZAR off the Hyattsville lot. The vehicle was later confirmed to have been fraudulently rented from a rental car company in Columbia, Maryland. The following day, the stolen red Jeep Wrangler was loaded into a shipping container bearing the identification number GCNU4731460.

21.     On or about September 6, 2019, **TURAY** drove a stolen red Toyota RAV 4 with Ohio registration HQS2844 to the Hyattsville lot and watched as the Toyota Rav-4 was loaded into the same container, GCNU4731460. At the same time, BALTAHZAR delivered a stolen white Jeep Compass with Virginia registration UST6923 to the lot and it was loaded into the same shipping container. Both vehicles were fraudulently rented in Maryland.

22.     The stolen Jeep Wrangler, the stolen Toyota RAV-4, and the stolen Jeep Compass were later recovered from the container GCNU4731460 at the Port of Baltimore on or about September 19, 2019.

23.     On or about September 12, 2019, **TURAY** drove a silver Toyota Highlander, with Florida registration LDRZ97 to the Hyattsville lot with BALTHAZAR as a passenger.  After parking the Highlander on the lot, **TURAY** left the Hyattsville lot in a stolen silver Jeep Wrangler with New York registration JGU2662 with BALTHAZAR as the passenger.  The silver Jeep Wrangler was later observed parked in a parking lot in Bladensburg, Maryland used as a staging area by the co-conspirators (the "Bladensburg parking lot").  BALTHAZAR later arrived at the Bladensburg parking lot driving a white Jeep Compass with New York registration JGT5866 with **TURAY** as a passenger.   The Jeep Compass was fraudulently rented by BALTHAZAR the same day at a Hertz location in Woodbridge, Virginia using the name "Faroop Jenkins" and a fraudulent Illinois driver's license bearing BALTHAZAR's photo:



24.     After arriving at the Bladensburg parking lot, **TURAY** exited the stolen Jeep Compass and entered the driver's seat of the silver Jeep Wrangler.  Before  he entered the silver Jeep Wrangler, during surveillance I captured the below photograph of **TURAY** at the

Bladensburg parking lot wearing a black Burberry t-shirt and a black Nike hat while talking on his cell phone:



25.     **TURAY** then drove to the Hyattsville lot where the stolen Jeep Wrangler was loaded into a shipping container with the identification number MRKU3871318.  In surveillance video obtained from neighboring businesses to the Hyattsville lot, **TURAY** can be seen photographing the silver Jeep Wrangler with his cell phone after it was loaded into the shipping container:



26.     Both the Jeep Wrangler and the Toyota Highlander that **TURAY** was seen driving on September 12, 2019 later were recovered from the container at the Port of Baltimore on September 23, 2019.

27.     On October 9, 2019, **TURAY** was seen during physical surveillance with DAVIS in Bladensburg, Maryland.  **TURAY** was seen looking inside a stolen silver Nissan Pathfinder bearing vehicle identification number 5N1DR2MM6KC620512 while DAVIS removed the license plate from the vehicle.  The silver Nissan Pathfinder was later recovered from a shipping container bearing the identification number HASU4344572 at the Port of Baltimore on or about October 23, 2019. As part of his guilty plea, DAVIS admitted to the receipt and possession of the stolen the silver Nissan Pathfinder.

28.     On November 12, 2019, **TURAY** was seen during physical surveillance with another co-conspirator, Edward OLSON ("OLSON") driving a black Jeep Cherokee with Florida license plate LDWW78 at the Bladensburg parking lot and then at an Exxon on Annapolis Road in Bladensburg.  The Jeep Cherokee later was confirmed to have been fraudulently rented on or about November 12, 2019 at an Avis location in Alexandria, Virginia.  The stolen Jeep Cherokee was later recovered by Avis while parked in Laurel, Maryland.

### A.  BALTHAZAR's Jail Calls to TURAY Following His Pennsylvania Arrest

29.     On February 7, 2022, BALTHAZAR was arrested in Somerset County, Pennsylvania following a high-speed vehicle pursuit on the Pennsylvania Turnpike for over 30 miles reaching speeds up to 121 miles per hour. After law enforcement deployed spike strips, the vehicle BALTHAZAR was operating was disabled and BALTHAZAR was stopped and arrested by the Pennsylvania State Police (PSP) in Somerset County, Pennsylvania. The vehicle that BALTHAZAR was operating, a red Toyota RAV-4, was later determined to be a fraudulently

rented vehicle rented from an Avis/Budget location in Pittsburgh, Pennsylvania on or about February 7, 2022.

30.     After his arrest, BALTHAZAR was transported to the Somerset County jail, where he attempted to make bail. I obtained access to BALTHAZAR's jail calls made during his detention at the Somerset County jail.  BALTHAZAR's first phone call was to his ex-girlfriend in order to get the phone number for someone he referred to as "his man."  BALTHAZAR asked her to contact his man's cousin for "his new 818 number." BALTHAZAR's ex-girlfriend conducted a 3-way call with an unidentified male that provided BALTHAZAR with the phone number 818-619-1785.

31.     Database checks through CLEAR identified phone number 818-619-1785 as belonging to **TURAY**. The same phone number is also listed on **TURAY**'s Bank of America accounts. In addition, **TURAY** provided law enforcement with the phone number 818-619-1785, during a September 19, 2020 arrest in Calvert County, Maryland.

32.     The second call BALTHAZAR made was to **TURAY** using the 818-619-1785. BALTHAZAR spoke to a male believed to be **TURAY** during that call about his arrest and his bail and **TURAY** indicated that he would try to get a bail bondsman. A later call to 818-619-1785, BALTHAZAR spoke to the same male subject believed to be **TURAY**. During the conversation, BALTHAZAR talked about the high-speed chase that led to his arrest. **TURAY** stated that he was ahead of BALTHAZAR on the highway and indicated that he had tried to direct BALTHAZAR around a set of spike strips that troopers set up to stop BALTHAZAR. **TURAY** told BALTHAZAR that he saw about ten state troopers waiting for BALTHAZAR at a rest stop on the highway during the chase.

33.     In another call with a female refers to as "Bri" and an unknown male, BALTHAZAR talked about the high-speed chase that he was arrested for and stated that he was on the phone with "my man" who was about 20 minutes ahead of him when law enforcement first attempted to stop him. BALTHAZAR stated that he asked "his man" what he should do and that he said, "bust them." BALTHAZAR stated he then led the troopers on a high-speed chase.

34.     Based on my training and experience, I believe that BALTHAZAR and **TURAY** were transporting the stolen rental car from Pittsburgh back to Maryland when Pennsylvania State Police attempted to stop BALTHAZAR and that **TURAY** directed BALTHAZAR to flee from police and attempted to assist him in evading the spike strips deployed by law enforcement.

### B.  BALTHAZAR's Jail Calls to TURAY Following His Tennessee Arrest

35.     Following his June 2, 2022 arrest in Nashville, Tennessee, while being held in the Davidson County jail, BALTHAZAR made several phone calls. I was able to obtain access to those calls and identified that on or about June 4, 2022 BALTHAZAR called **TURAY**'s phone number, 818-619-1785, for approximately 16 minutes. During the call, BALTHAZAR asked **TURAY** to get him a bail bondsman. **TURAY** told BALTHAZAR that he had already called 5 to 6 bail bondsmen they wanted 10-15% and "proof." BALTHAZAR told him **TURAY** had a bail review hearing on Monday.  **TURAY** told BALTHAZAR to be patient and that he would do everything to get him out by Tuesday.   BALTHAZAR then told **TURAY** about the circumstances of his arrest in Nashville.  BALTHAZAR said that he was in a car by a TJ Maxx and had backed in a spot to try and stay out of sight and police boxed him in and he was unable to go anywhere and that he took a chance at getting shot to be sure that he locked his phone before he was arrested.  **TURAY** asked BALTHAZAR which car he was in and BALTHAZAR responded, "the Equinox." In response, **TURAY** said "y'all wasn't getting no where in that."

BALTHAZAR then handed the phone to one of his cellmates (believed to be one of the two co-conspirators BALTHAZAR was arrested with) who spoke to **TURAY** in what sounded like a West African dialect or foreign language.

36.     I was able to obtain body camera footage of the roadside and custodial interviews of **TURAY**, during his September 19, 2020, arrest in Calvert County Maryland. I reviewed the video and audio footage and identified the individual as **TURAY.** The voice of **TURAY** during that interview, matched the voice of the individual BALTHAZAR spoke to when calling 818-619-1785, during his recorded Pennsylvania and Tennessee jail calls.

## IV.    <u>TURAY's Involvement in a Recent Bank Fraud Scheme</u>

37.     On or about February 17, 2023, I received information from Bank of America that **TURAY** is the owner of a Bank of America business account ending in 4395 in the name of A-1 LOGISTIC HANDLING L C ("BOA 4395"). On or about September 29, 2022, **TURAY** deposited an altered check in the amount of $200,913.62 drawn on a U.S. Bank account held by the American United Life Insurance Company into BOA 4395 at a Bank of America branch in Bel Air, Maryland.  **TURAY** was captured on surveillance video making the deposit wearing a distinctive Balenciaga designer denim jacket:







The altered check (pictured below) was made payable to **TURAY** and his company, A-1 Logistics Handling LLC:



38.     On or about December 23, 2022, U.S. Bank reported to Bank of America that the payee on this deposit item had been altered.

39.     **TURAY** withdrew the proceeds of the altered check between on or about October 11, 2022, and on or about November 14, 2022 through cash withdrawals and debit card

purchases. These withdraw transactions occurred at various Bank of America locations in Maryland. In the surveillance images from the October 11, 2022 withdrawal, **TURAY** can be seen showing his cellphone to the bank teller:



40.      Further investigation has confirmed that **TURAY** opened BOA 4395 on or about December 13, 2021 and is the only an authorized signer on the account.  Bank of America records indicate that that address listed on BOA 4395 is 5871 Bella Marie Way, Frederick, Maryland 21703.  Additionally, the phone number listed on the account 818-619-1785 is the same number used by **TURAY** to communicate with BALTHAZAR on jail calls.

41.      **TURAY** registered A-1 Logistic Handling L C with the Maryland State Department of Assessments and Taxation ("SDAT") on or about November 23, 2021.  **TURAY** is listed as the owner and resident agent of A-1 Logistic Handling L C. The listed address for A-1 Logistic Handling LC is 5871 Bella Marie Way, Frederick, Maryland 21703—the address adjacent to the **TARGET RESIDENCE**.

42.    Surveillance photographs obtained from Bank of America, show that **TURAY** conducted a banking transaction on December 9, 2022, at a drive-up ATM located in Frederick, Maryland while driving the **TARGET VEHICLE**.  In the surveillance photograph, **TURAY** appears to be the only person occupying the front passenger compartment of that vehicle.



### V.    The TARGET VEHICLE and the TARGET RESIDENCE

43.    Through a search of law enforcement databases, I learned that on October 25, 2022 **TURAY** was pulled over by the Maryland State Police for a window tint violation on U.S. 50 Eastbound at MD 424, in Anne Arundel County, Maryland. At the time, **TURAY** was operating the **TARGET VEHICLE**. A check of the **TARGET VEHICLE**'s registration through the Maryland Motor Vehicle Administration ("MVA") revealed that it was registered to Treasure Eboni Thompson at the **TARGET RESIDENCE**.

44.    An updated check of **TURAY** through MVA revealed that his address was listed as the address adjacent to the **TARGET RESIDENCE**—5871 Bella Marie Way Frederick, Maryland 21703. A search of the real property database through the Maryland SDAT, revealed that 5871 Bella Marie Way is owned by Brittany A. Richardson. Checks through several law

enforcement databases, including CLEAR, Accurint and Linx, revealed no connection between **TURAY** and Brittany A. Richardson.

45.     Additional checks through law enforcement databases, revealed that on or about October 22, 2021, **TURAY** and Treasure Eboni Thompson (the registered owner of the Lexus vehicle described in paragraph 43 above) were encountered by U.S. Customs and Border Protection (CBP), while traveling back to the United States from Aruba. During that encounter, **TURAY** advised CBP officers that Thompson was his girlfriend and that they traveled to Aruba for two days to celebrate her birthday. Further information gathered by CBP revealed that **TURAY** had previously listed his occupation as a packer for his girlfriend's company "TREASUREGEMS." A check through law enforcement databases revealed that Thompson's current address is listed as the **TARGET RESIDENCE**, and she is connected to a business named TREASUREGEMZ.

### A.   Surveillance of TURAY at the TARGET RESIDENCE

46.     On February 8, 2023, at approximately 1400 hours, I conducted surveillance in the area of 5871 and 5872 Bella Marie Way in Frederick Maryland. This surveillance operation was intended to locate **TURAY** and identify which address he was residing in. I observed the **TARGET VEHICLE** parked in the driveway of the **TARGET RESIDENCE**. The **TARGET RESIDENCE** is a townhouse with a rear entry driveway and garage pictured below:



47.     On February 20, 2023, at approximately 1100 hours, I conducted surveillance in the area of 5871 and 5872 Bella Marie Way in Frederick Maryland. At approximately 1156 hours, I observed a black male, wearing a black hooded jacket and black pants in the driveway of the **TARGET RESIDENCE**. The physical stature of that individual was very similar to **TURAY**, but I was unable to positively identify him. At approximately 1158 hours, that same individual walked out of the front door of the **TARGET RESIDENCE** and walked towards the street. I was unable to see exactly where he went, due to a large van blocking my view. A few

seconds later, a late model Blue Nissan Sentra, with a Maryland temporary registration drove away from the area that the unidentified male was last seen in. At approximately 1220 hours, I observed the same Blue Nissan Sentra pass my location and stop at the driveway behind the **TARGET RESIDENCE**. The Nissan was being operated by a different unknown black male and the front passenger seat was unoccupied. The rear passenger seat was occupied by a male that looked like the individual I observed leave the **TARGET RESIDENCE** earlier the same day. A short time later, the same black male wearing the black hooded jacket and black pants came into clear view in the driveway of the **TARGET RESIDENCE**. At that point in time, I was able to positively identify that individual as **TURAY**. **TURAY** was carrying a white bag in his hand, that he didn't have when he first left the location. **TURAY** then lit a cigarette and stood in the driveway for a short time. During that time, **TURAY** continuously looked around and appeared to be canvassing the area and his surroundings, to include what appeared to be two long looks at the location where my vehicle was parked. **TURAY** then walked inside the garage in the rear of the townhouse and disappeared from my view.

48.     Through training, knowledge, and experience, I know that criminals often list and provide addresses near where they are actually living, where they no longer reside, or have never resided. This is a common tactic used to avoid detection by law enforcement and other entities. In this case, I have probable cause to believe that **TURAY** is residing at the **TARGET RESIDENCE**. During multiple surveillances, **TURAY** has not been seen entering or exiting his purported residence, 5871 Bella Marie Way. I have conducted numerous law enforcement database checks and have found no additional connections linking **TURAY** to 5871 Bella Marie Way.

## SEIZURE OF ELECTRONIC MEDIA

49.     Based on knowledge, training, and experience, your affiant is aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation because the objects themselves may be instrumentalities, fruits, or evidence of the crime, and/or because the objects may have been used to collect and store information about crimes in the form of electronic data.

50.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the **TARGET RESIDENCES** in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other electronic storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51.     *Probable cause*. Your affiant submits that if a computer or storage medium is found in the **TARGET RESIDENCE**, the **TARGET VEHICLE**, or on **TURAY**'s person, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on knowledge, training, and experience, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

52.  *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the **TARGET RESIDENCE**, the **TARGET VEHICLE**, or on **TURAY**'s person because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration

files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

53.  *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

d. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

54.     In light of the issues enumerated above, I request the Court's permission to seize the computer hardware and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and conduct an offsite search of the hardware for relevant evidence if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware onsite for this evidence.

## **CONCLUSION**

55.     Based upon the information contained in this affidavit, I respectfully submit that there is probable cause to believe that a search of the **TARGET RESIDENCE**, the **TARGET VEHICLE**, and **TURAY**'s person as further described in Attachments A-1, A-2, and A-3, which are to be searched in accord with Attachment B, will uncover evidence, fruits, and/or instrumentalities of violations of the **Target Offenses**.

I affirm under penalty of perjury that the facts and circumstances recounted in the foregoing affidavit are true and accurate to the best of his knowledge and belief.

_____
Thomas E. Davis
Task Force Officer
Homeland Security Investigations


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 17th day of March, 2023.

_____
Honorable Timothy J. Sullivan
United States Magistrate Judge

## <u>ATTACHMENT A-1</u>
### Property to be Searched

The property to be searched, that is, the **TARGET RESIDENCE**, is located at 5872 Bella Marie Way Frederick, MD. 21703, further described as a three-story house with an attached two-car garage with a tan front door.  The number "5872" appears to the right side of the front door.  The rear of the residence has red exterior siding with a tan in color vinyl balcony and garage door.

The **TARGET RESIDENCE** to be searched includes all rooms, containers, safes, storage spaces and curtilage at the **TARGET RESIDENCE**.



**Front of TARGET RESIDENCE**



**Rear of TARGET RESIDENCE**

### ATTACHMENT A-2
**Property to Be Searched**

The property to be searched, that is, the **TARGET VEHICLE**, is a 2020 Lexus RX-450

bearing Maryland Registration 1FD8845, VIN: 2T2HGMDA0LC056213, that is located in

Frederick, Maryland.



**ATTACHMENT A-3**
**Person to be Searched**

The person to be searched is **ABDUL TURAY,** a/k/a Abdul Karim **TURAY**, Abdul

Ibrahim **TURAY**, and Abdul Karim Ibrahim **TURAY**, Jr. ("**TURAY**").   **TURAY** is listed as

being approximately 5 feet and 6 inches tall.  His approximate weight is 220 pounds.  **TURAY** is

a black male who is 29 years old.  His date of birth is June 19, 1993.

The search of **TURAY** includes any and all clothing and personal belongings, backpacks,

briefcases, purses and bags that are within **TURAY**'s immediate vicienty and control, wherever

**TURAY** may be found within the District of Maryland.  **TURAY** is depicted in the following

photograph:



With respect to **TURAY**, the United States is also authorized to seize and search any cell

phone or other electronic devices.

**ATTACHMENT B**
**Items, Records, And Information To Be Seized**

All records, documents, items, data, and other information that may constitute fruits or instrumentalities of, or contain evidence related to, conspiracy to commit interstate transportation of stolen motor vehicles, in violation of 18 U.S.C. § 371, interstate transportation of stolen motor vehicles, in violation of 18 U.S.C. § 2312, receipt and possession of stolen vehicles, in violation of 18 U.S.C. § 2313, and bank fraud, in violation of 18 U.S.C. § 1344 (collectively, the "Target Offenses"), that have been committed by Abdul **TURAY** ("**TURAY**"), Rodley BALTHAZAR, and Jonathan DAVIS, and others known and unknown, including, but not limited to, the following that may be found in the locations or on the person described in Attachments A-1 through A-3 (collectively, the "Target Locations").

1.      Books, notebooks, records, documents, correspondence, bills, receipts, data, images, videos, or information relating to such offenses, including any records or documents or other evidence regarding:

      a.      Financial records, bank records (including account opening documents and receipts from deposits and withdrawals), checkbooks, payroll information, ledgers, credit applications, loan documents, wire transfer records, records on income from any source, and other financial information;

      b.      The rental or attempted rental of vehicles from rental car companies, including Avis, Budget, and Hertz;

      c.      Creating, obtaining, using, or possessing fraudulent identification documents (e.g., driver's licenses), and fraudulent credit and debit cards in the name of other individuals;

      d.      Identity information (including names, addresses, social security numbers, and dates of birth) of persons other than the residents of the premises to be searched, including identification documents and credit and debit cards in the name of persons other than the residents of the premises to be searched;

      e.      Receiving, possessing, concealing, storing, bartering, selling or disposing of stolen vehicle, including fraudulently-rented vehicles;

f.      The transportation of stolen vehicles, including fraudulently-rented vehicles from one point to another;

g.      The rental of shipping containers or other storage units;

h.      Contracts, invoices and communications with freight forwarders and shipping companies;

i.      Documentation regarding the exportation of goods, including vehicles, outside of the United States, including, but not limited to, West Africa;

j.      The filing of fraudulent unemployment insurance claims with the California Economic Development Department (EDD) or other state or federal agencies;

k.      Records and documents relating to the preparation, submission, processing, or handling of applications for unemployment insurance claims, and correspondence to and from the California Economic Development Department (EDD) or other state or federal agency unemployment benefits;

l.      The forgery or alteration of checks and other financial instruments;

m.      Financial or other transactions involving fraudulently obtained funds, including any information regarding currency, checks (including the U.S. Treasury), debit cards, stored value cards, or other financial instruments relating to the illicit proceeds, including the use or spending of such proceeds;

2.      Vehicle keys, titles, registration documents, registration plates (i.e. license plates), and any other documents displaying vehicle identification numbers, serial numbers and/or other identification numbers.

3.      Any documents/electronic media related to vehicle keys or vehicle key codes.

4.      Any paper stock, printers, laminators, label makers or devices believed to be used for the manufacturing of fraudulent vehicle titles, vehicle paperwork, vehicle labels and vehicle VIN plates.

5.      Records and information that constitute evidence of identity, including but not limited to, the following clothing and accessories worn by **TURAY** during the commission of the Target Offenses on the relevant dates:  the black Nike baseball cap and black Burberry t-shirt word by **TURAY** on September 12, 2019; and the Balenciaga denim jacket worn by **TURAY** on September 29, 2022.

6.      Any and all documents, records, or correspondence pertaining to the occupancy, ownership or other connection to the TARGET RESIDENCE and TARGET VEHICLE.

7.      Records and information relating to the identity or location of the suspects and their co-conspirators.

8.      Records and documents relating to the identities or location of victims of the fraud scheme.

9.      Evidence to include phone numbers, phone directories, computer directories and files, personal directories, picture phones and their contents, credit card accounts, financial statement papers and account information, photographs of conspirators together, any video or audio tapes of conspirators together, correspondence between members of the conspiracy.

10.     Any and all records or information related to communications, in any format to include electronic communications, with co-conspirators related to the commission of the TARGET OFFENSES.

11.     Indicia of travel, including but not limited to, passport, visas, airline tickets, boarding passes, and airline receipts.

12.     Safes (combinations or lock-type) and their contents.

13.     Digital devices used in the commission of, or to facilitate, or to communicate above, the Target Offenses, including cell phones, laptops, tablets (e.g. iPads) and USB drives.

14.     Any and all records, documents or information related to the location of the user(s) of the devices or the location of the user(s) of other devices, with which the target device has had contact, to the extent that those records constitute evidence, fruits, or instrumentalities of violations of federal law.

15.     Passwords and encryption keys, and other access information that may be necessary to access the account and other associated accounts.

16.     Indicia of ownership, use, and control of electronic devices and equipment in the Target Locations.

17.     All images, videos, messages, and communications regarding photographs or videos of coconspirators, of assets, and/or other documents identifying associates and co-conspirators, as well as regarding methods to avoid detection by law enforcement.

18.     Proceeds and fruits of the Subject Offenses, including United States currency in the amount of more than $1,000 and financial instruments, such as cashier's checks, money orders, wire transfer receipts, ledger sheets, checkbooks, passbooks, safe deposit keys and other documents of financial records which evidence the obtaining, transfer, exchange, transportation and/or expenditure and/or concealment of large sums of money, precious metals, jewelry, cryptocurrency and related encryption keys or devices to access cryptocurrency coin purses, and other items of value, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money.

19.     Any records or materials relating to ownership or possession of any item having a

value of over $1,000.

20. As used above, the terms "records" and "documents" include all of the foregoing items in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage media (such as flash memory or other media that can store data) and any photographic form.

21. Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the specified criminal offenses. The following definitions apply to the terms as set out in this affidavit and attachment:

a. Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Hardware includes any data-processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

b. Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

c. Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touches.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

22. As used above, the terms "records, documents, messages, correspondence, data,

iv

and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

23.     For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f.  evidence of the times the COMPUTER was used;

    g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    i.  contextual information necessary to understand the evidence described in this attachment.

24.     With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that

data falls within the items to be seized):

    a.  surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

    b.  "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

    c.  "scanning" storage areas to discover and possible recover recently deleted files;

    d.  "scanning" storage areas for deliberately hidden files; or

    e.  performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.